The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Shawn Balbas SOUVA, Defendant–Appellant.

No. 02CA0741.

Colorado Court of Appeals, Div. III.

Oct. 6, 2005.

Certiorari Denied Sept. 11, 2006.*

* Justice EID does not participate.

John W. Suthers, Attorney General, Anthony J. Navarro, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Anne Stockham, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

HAWTHORNE, J.

Defendant, Shawn Balbas Souva, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree murder after deliberation. We affirm.

## I. Background

Defendant called 911 and reported that he and the victim had been attacked by an intruder in his apartment. Defendant told the 911 dispatcher that the intruder hit him on the back of the head and he passed out. He stated that when he woke up, his feet were shackled, and the attacker was beating the victim. Defendant stated that he escaped, but left the victim at the apartment and began to drive to the hospital. Defendant told the dispatcher that the incident had occurred a couple of hours earlier, but he had not notified the police because he had passed out in his car in a gas station parking lot on the way to the hospital.

Defendant gave the dispatcher the location of his apartment complex and stated that his apartment number was M–201. However, several seconds later he told the dispatcher that his apartment number was actually N–201.

Officers were dispatched to apartment M–201, but determined that it was vacant. The dispatcher then told the officers that the apartment number was N–201, but when they checked that apartment, the officers discovered that it was inhabited by a couple who stated there had been no disturbance. The officers returned to building M and decided to check with all the residents in the building to verify whether an assault was taking place as reported by defendant.

One officer checked the third floor and noticed a light on in apartment M–301, which was located directly above M–201. He knocked on the door, but received no response. After determining that the door was unlocked, he notified the other officers, and they entered the apartment.

The officers discovered the victim lying face down on the floor in a pool of blood. Her hands had been taped behind her back and a chain was wrapped around her neck. There were shackles lying near her feet, and a spent bullet casing was lying on the floor. The officers searched the apartment, but did not find any other victims or a suspect. One of the officers felt the victim's neck, but was unable to detect a pulse. The officer then called for a paramedic, who concluded that the victim was dead. The autopsy later revealed that the victim had died from a single gunshot wound to the head. Once the officers determined the victim was dead, they exited the apartment and did not reenter it until after they had obtained a search warrant.

Defendant was arrested and charged with first degree murder after deliberation. He was convicted after a jury trial and sentenced to life in prison without parole.

## II. Warrantless Search

Defendant contends that the trial court erred in denying his motion to suppress evidence obtained in the search of his apartment because the search violated his Fourth Amendment rights. We disagree.

■ On review of a denial of a suppression motion, we defer to the trial court's findings of historical fact, but review its application of legal standards to those facts de novo. *People v. Cruse*, 58 P.3d 1114 (Colo.App.2002).

■ Generally, the Fourth Amendment requires the police to establish probable cause and secure a warrant before conducting a search. However, the general rule against warrantless searches is subject to specifically established and well-delineated exceptions. *People v. Edwards*, 836 P.2d 468 (Colo.1992).

As pertinent here, the emergency aid exception applies when there is "a colorable claim of an emergency threatening the life or safety of another," and it is an exception to both the warrant and probable cause requirements. *People v. Hebert*, 46 P.3d 473, 479 (Colo.2002).

However, this exception "does not give police officers carte blanch[e] to make a warrantless entry whenever there is a theoretical possibility that another's life or safety is in danger." *Hebert, supra,* 46 P.3d at 479. Rather, there must be both an immediate crisis and the probability that assistance will be helpful. The police must also have a reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. *Hebert, supra.*

Moreover, the police officer's primary purpose in conducting the search must be to render emergency assistance, not to search for evidence. Accordingly, the emergency search is strictly limited by the exigency arising from the emergency and does not support a general exploratory search. *People v. Allison,* 86 P.3d 421 (Colo.2004).

The prosecution has the burden of proving that the warrantless search was justified under the circumstances. In considering the application of the emergency aid exception, the court "must examine the totality of the circumstances as they would have appeared to a 'prudent and trained police officer' at the time the decision to conduct the warrantless search [wa]s made." *Hebert, supra,* 46 P.3d at 480 (quoting *People v. Smith,* 40 P.3d 1287, 1290 (Colo.2002)).

Here, defendant reported to the 911 dispatcher that he had last observed the victim being beaten by an intruder in his apartment. The police were first advised that defendant's apartment number was M–201, and subsequently, that it was N–201. Because the police had not discovered a disturbance at either apartment, and because defendant appeared to be confused about the specific apartment number, the trial court was correct in finding that it was reasonable for the police to conclude that an attack upon the victim might still be in progress at the apartment complex.

In addition, one officer noticed that the light was on in defendant's apartment even though it was approximately three o'clock in the morning. There was no response when the officer knocked on the door, and he discovered the door was unlocked. Moreover, defendant's apartment turned out to be M–301, located directly above M–201, the first apartment number given by defendant.

Defendant contends that because the police decided to check with all the residents in building M, they were conducting a general exploratory search, which is prohibited under the emergency aid exception. However, based on defendant's confusion regarding the apartment numbers and the violent nature of the reported assault, the trial court was correct in finding that it was reasonable for the police officers to continue to search the apartment complex for the victim, particularly the apartment located directly above the original apartment identified by defendant. The purpose of checking with residents throughout building M was not to obtain evidence, but instead to render emergency assistance.

Defendant's reliance on *Hebert, Allison,* and *People v. Pate,* 71 P.3d 1005 (Colo.2003), is misplaced. In those cases, the supreme court declined to apply the emergency aid exception to justify a warrantless search. However, those cases are distinguishable.

In *Hebert,* the police found a dead body in the trunk of a car. They traced the car to the defendant and went to his residence. Although there had been no reports of any commotion inside the defendant's house, the police entered without a warrant. The police testified that it was not outside the realm of possibility that there were other victims inside the defendant's home. The supreme court refused to apply the emergency aid exception because there was no evidence to support a finding that an immediate crisis existed inside the house.

In *Pate,* the officers responded to a 911 call regarding a burglary. After finding no disturbance at the specified address, the police were directed by several individuals to a nearby apartment complex where they had heard the sound of breaking glass and someone shout, "Let her go." When the police arrived, they had no information that any illegal activity was occurring inside the defendant's apartment. The police entered without a warrant and discovered the defendant, who was injured and bleeding. Again, the court refused to apply the emergency aid exception because the officers did not have any credible evidence that an immediate crisis existed at the defendant's apartment.

Finally, in *Allison,* the police were dispatched to a residence after a 911 hang-up call. The police knocked on the door, and a woman answered. She appeared to be out of breath and had blood around her nose.

The woman eventually allowed the police to enter the residence, and the legality of this entrance was not at issue. The woman's husband then appeared and was taken into custody. The police asked the husband whether anyone else was in the house, and he replied that a third individual lived upstairs, but that he was uncertain as to whether that person was home. *Allison, supra.*

The police then took the husband outside, and one officer reentered the house without a warrant or permission to look for other individuals. In searching the house, the officer discovered some marijuana and drug paraphernalia, but did not seize it and continued checking the house. The officer exited the house and then entered it for a third time to take pictures of the premises, including the marijuana and drug paraphernalia. *Allison, supra.*

Similar to *Hebert* and *Pate,* the court concluded that the emergency aid exception did not apply to the officer's entrance into the house the second and third times because no immediate crisis remained. The husband and the wife had been removed from the house, and there was no indication that the third individual or any children were involved in the dispute or needed emergency assistance. *Allison, supra.*

Here, it was clear that the officers' main purpose was to render aid to the victim, not to search for evidence. When they entered the apartment, an officer checked her pulse and called a paramedic. Once the officers determined that the victim was deceased, they left the apartment to obtain a search warrant.

We conclude that under the totality of the circumstances presented here, prudent and trained police officers would have determined both that an immediate crisis existed and that there was a probability that their emergency assistance would have proved helpful. *See People v. Kluhsman,* 980 P.2d 529 (Colo.1999)(warrantless search of the defendant's house was justified for the purpose of searching for injured people).

Accordingly, the trial court correctly applied the emergency aid exception to the warrantless search of defendant's apartment, and therefore, his Fourth Amendment rights were not violated.

### III. Intoxication Testimony

Defendant contends that the trial court violated his constitutional rights by admitting testimony from the mother of one of his friends. According to defendant, admission of this testimony was erroneous because, although the mother was not qualified as an expert witness, she testified that she did not believe that defendant was under the influence of drugs on the night of the murder. We disagree.

■ Defendant did not object to the mother's testimony at trial. Accordingly, plain error is the appropriate standard of review. *See People v. Miller,* 113 P.3d 743 (Colo. 2005). Plain error is obvious and substantial error that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Miller, supra.*

■ Absent an abuse of discretion, we will not disturb a trial court's evidentiary rulings on appeal. *People v. Ibarra,* 849 P.2d 33 (Colo.1993).

CRE 701, which authorizes opinion testimony by lay witnesses, provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Expert testimony is testimony that is based on "scientific, technical, or other specialized knowledge." CRE 702.

At trial, the mother testified that defendant was her son's friend and she had known him for approximately five or six years. She also stated that she knew defendant's family.

The mother testified that defendant called her on the night of the murder to ask her whether he could stay at her house. The prosecutor and the mother then had the following exchange:

Prosecutor: Okay. And did you tell him that he could stay?

Mother: I asked him if he was clean.

Prosecutor: And what do you mean by that?

Mother: Off of drugs.

Prosecutor: Okay. And what did he respond?

Mother: Yes, he had been clean since we talked last.

Prosecutor: Okay. And did it sound to you like he was clean, so to speak?

Mother: Yes.

Prosecutor: And do you have any training in that area at all, in the area of drugs, dealing with people who do drugs?

Mother: Yes, I do.

Prosecutor: And what is that?

Mother: I'm a certified addictions counselor in Colorado.

The mother further testified that defendant appeared to be "clean" when he arrived at her house at approximately three o'clock that morning.

■■■ Colorado law is well established that once the proper foundation has been laid, a lay witness may express an opinion as to whether a defendant was under the influence of alcohol. *People v. Norman,* 194 Colo. 372, 572 P.2d 819 (1977); *see also Jones v. Blegen,* 161 Colo. 149, 420 P.2d 404 (1966); *Brown v. Hollywood Bar & Cafe,* 942 P.2d 1363 (Colo.App.1997). However, whether lay opinion testimony is admissible to prove drug-induced intoxication is a matter of first impression. We find no basis, and defendant has given us none, upon which to distinguish lay testimony regarding alcohol-induced intoxication from lay testimony regarding drug-induced intoxication, as long as the proper foundation has been laid.

Our conclusion is supported by the majority of decisions from other states. *See People v. Davis,* 6 Ill.App.3d 622, 286 N.E.2d 8 (1972)(opinion testimony of a lay witness as to whether defendant was under the influence of drugs is admissible where the proper foundation was laid); *State v. Lindley,* 286 N.C. 255, 210 S.E.2d 207 (1974)(a lay witness may express his or her opinion as to whether an individual is under the influence of drugs when he or she has observed the person and the testimony is relevant to the issue being tried); *Commonwealth v. Yedinak,* 450 Pa.Super. 352, 676 A.2d 1217 (1996)(finding no basis to distinguish lay opinion testimony of drug-induced intoxication from lay opinion testimony of alcohol-induced intoxication where the witness is personally familiar with the effects of narcotics); *State v. Brett,* 126 Wash.2d 136, 892 P.2d 29 (1995)(trial court properly allowed convenience store clerk to give her lay opinion that the defendant did not appear to be under the influence of drugs, where her opinion was based on observing the defendant twice that evening and her perception was informed by prior police experience with individuals who were under the influence of drugs). *But cf. State v. Rifkin,* 140 Vt. 472, 438 A.2d 1122 (1981)(an arresting officer or other witness may render an opinion as to whether a defendant was under the influence of drugs only when qualified as an expert).

■■■ Here, the mother testified that she was a certified addictions counselor who had experience dealing with drugs and people who used drugs. She further testified that she knew defendant and had two opportunities to observe his behavior on the night of the murder. Therefore, the prosecution laid a sufficient foundation, and admission of the mother's testimony as lay opinion was within the trial court's discretion.

The fact that the mother was a certified addictions counselor did not cause her testimony to become expert testimony. *See Scognamillo v. Olsen,* 795 P.2d 1357, 1361–62 (Colo.App.1990)(quoting *McNelley v. Smith,* 149 Colo. 177, 368 P.2d 555 (1962))("The basis for admissibility [of expert testimony] under CRE 702 is ... not that the witness possesses skill in a particular field but that 'the witness can offer assistance on a matter not within the knowledge or common experience of people of ordinary intelligence.'"); *see also United States v. Novaton,* 271 F.3d 968, 1008 (11th Cir.2001)(emphasizing that a witness does not fall outside of Rule 701 simply because his or her rational perception is

based on past experience); *United States v. Myers*, 972 F.2d 1566 (11th Cir.1992)(police officer's testimony that red mark was caused by a stun gun was not expert testimony because it was rationally based upon his personal perception of the victim's back and his nineteen years of experience on the police force).

Although the mother possessed the skills necessary to counsel people with addictions, her testimony concerned a matter within the knowledge or common experience of people of ordinary intelligence. *Scognamillo, supra.* Therefore, her testimony was rationally based on her perception of defendant's condition and her experience in dealing with people who are under the influence of drugs. *Myers, supra.*

Similarly, defendant's reliance on *People v. Stewart*, 55 P.3d 107 (Colo.2002), is misplaced. In *Stewart*, the supreme court concluded that the trial court erred in allowing a police officer to testify as a lay witness regarding the reconstruction of a crime scene where a vehicle struck a pedestrian. The court concluded that the officer's deductions about such matters as the vehicle's direction, position, and speed were actually expert testimony based on the officer's technical knowledge and experience.

Here, we have concluded that the mother's testimony was lay opinion that was based on a matter of common knowledge or experience, and therefore, it was not based on any technical knowledge. Therefore, *Stewart* is inapplicable.

Accordingly, we discern no error, plain or otherwise, in the admission of the mother's testimony.

### IV.  Jury Instruction

Defendant contends that the trial court erroneously instructed the jury regarding the evidence of intoxication because the instruction contained the word "negate," rather than the word "negative," as stated in § 18–1–804(1), C.R.S.2005. We disagree.

■ Defendant did not object to the instruction at trial, and therefore, we review for plain error. *See Stewart, supra.* "In the context of jury instructions, plain error occurs when the entire record demonstrates a reasonable possibility that the improper instruction contributed to the defendant's conviction." *People v. Sweeney*, 78 P.3d 1133, 1137 (Colo.App.2003).

A trial court must correctly instruct the jury regarding the law applicable to the case. *People v. Rivas*, 77 P.3d 882 (Colo.App.2003).

The jury instruction on intoxication that was given at trial provided in part, "You may consider evidence of self-induced intoxication in determining whether or not intoxication negates the existence of the culpable mental states of specific intent or after deliberation."

■ Defendant contends that using the word "negate" instead of the word "negative" lowered the prosecution's burden of proof. However, "negative" is defined as "to negate; to deny, nullify, or render ineffective," while "negate" is defined as "to deny; to nullify; to render ineffective." *Black's Law Dictionary* 1060 (8th ed.2004). Therefore, we conclude that the two terms may be used interchangeably in this context.

Recent supreme court decisions support our conclusion. *See Miller, supra* (no plain error where there was no instruction that voluntary intoxication may negate the after deliberation element of first degree murder); *People v. Sepulveda*, 65 P.3d 1002 (Colo. 2003)(same); *People v. Harlan*, 8 P.3d 448 (Colo.2000)(same).

Although his argument is somewhat unclear, defendant's final contention is that by using the word "negate" instead of the word "negative," the instruction implied that intoxication was the sole evidence that the jury could consider in determining whether defendant acted with specific intent or after deliberation.

However, after reading the instruction in conjunction with § 18–1–804(1), we conclude that it clearly instructed the jury that evidence of intoxication was a factor it "may" consider in determining whether defendant had the requisite intent to commit the crime. Therefore, we reject defendant's contention.

We conclude that the record does not demonstrate a reasonable possibility that the trial court's jury instruction regarding intoxication

contributed to defendant's conviction, and thus, there was no plain error.

The judgment is affirmed.

Judge TAUBMAN and Judge CASEBOLT concur.